Good morning, ladies and gentlemen. The first case this morning is Lacy v. Cook County and Mr. Cassione. Your Honors, good morning. May it please the Court, Paul Castiglione on behalf of the Appalachian County of Cook and the Sheriff of Cook County. Your Honors, in this case, five plaintiffs filed a lawsuit alleging that the sheriff violated Title II of the American with Disabilities Act in connection with transportation to several courthouses in respect to accessible toilets and sinks at various detention cells. Now in pursuing these claims in district court, plaintiffs litigated three motions, a motion for preliminary injunction, class certification, and partial summary judgment, more or less Conflation of the litigation of these motions we submit led to error both in terms of procedure and substantive law that warrant reversal of the following four orders. One, the district court's order granting plaintiffs motion for summary judgment as to liability on their Title II claims. Two, the jury verdict entered in favor of plaintiff Jonathan Lacy and against the sheriff on the issue of damages on his Title II claim. Three, the order certifying a Rule 23B2 class for injunctive relief. And four, the order entering mandatory injunctive relief directing the movement of concrete barriers at the holding cells at the Maywood Courthouse 1.5 inches for the purported purpose of complying with the ADA. I'll address each order separately. First as to summary judgment. Now to show that the plaintiff, that the sheriff violated Title II of the ADA, plaintiffs were required to prove they were qualified individuals as to their disability, that they were denied the benefits of services, programs, or activities of a public entity, or otherwise subjected to discrimination by such an entity, and intentional discrimination at that, and that the denial or discrimination was by reason of a disability. Plaintiffs had the burden to show that the sheriff intentionally discriminated against them by reason of a disability. They did not meet that burden. Now the Ninth Circuit has held that the reasonableness of an accommodation at issue in a Title II claim is it presents a question of fact. We believe this court should apply the same standard, and the record here shows that plaintiffs never established that they were entitled to judgment on their Title II claims as to liability. The district court found that plaintiff submissions in support of their motion for summary judgment were inadequate, and instead used findings of fact that the district court made at an injunction. And the problem with that was that the district court ended up weighing evidence and making credibility determinations. This is not proper under Rule 56. Now the district judge had turned that motion for preliminary injunction into a motion for a permanent injunction, hadn't he? Ultimately, well I think when the motion was being adjudicated, Your Honor, it was for preliminary injunctive relief. He ultimately entered a permanent injunction. Did he ever tell you at any point during that hearing, what was it, six days, that he was in fact conducting a hearing on a permanent injunction? Your Honor, I was not there. I don't believe so. Not at that time. You don't think the record reflects that? This is crucial to your case. Be careful. Your Honor, I'd have to go back and look at the record. I'm not certain. I am not certain if the district court did in fact say that. I don't know. Did you ever object to the district court holding a plenary hearing and entering a permanent rather than a preliminary injunction? Well, by the time a permanent injunctive relief was entered, the sheriff had amended their general orders, Your Honor, to say that with regard to disabilities, deputy sheriffs would always push detainees in wheelchairs up and down ramps. So I don't think we did object ultimately to that injunctive relief because the general order had been changed and was more or less moot. That issue anyway. What I don't understand is why you can maintain that the district court erred in using his When you didn't object to his entering that permanent injunction, that to me is crucial to your case. And you've really got to have a good answer for that. Well, there were two types of relief being sought. There were damages and there was injunctive relief. And in terms of going forward on a damage claim, each of these plaintiffs had to be able to show, prove, meet the burden of showing that they were discriminated against. We don't feel they did. And we feel that liability on the damages claim never should have been entered in the first place. Now, ultimately, trials for damages did go forward. On three of them, the verdict was zero. Only on one was there damage entered, and that was Mr. Lacey for $600. That's the only real live damage. So the damages issue was trumped. It was trumped. To a jury. To a jury. No Seventh Amendment problem there. The damages issue, but the liability was not. What, with respect to liability, was not established during the hearing on the permanent injunction? What was not established was that the sheriff engaged in discrimination against Mr. Lacey or at that time any of the other plaintiffs. In fact, the evidence that was submitted in support of the motion for summary judgment showed to the contrary, that when assistance was needed, either for use of the ramps or for the bathroom. It just happened, despite the nonexistence of any policy, that these guys did get help. They did get help. There may have been an isolated incident. Does that mean that they weren't exposed to the sheriff's non-observance of the requirements of the act? They were still taking their chances every time they showed up, that somebody out of the goodness of his heart was going to help them, right? There was no sheriff's policy helping these guys. The sheriff did have a policy, Your Honor, and that was to provide help, provide whatever access was needed. What the sheriff ultimately- How was that established at the permanent injunction hearing? At the preliminary injunction hearing. It turned into a permanent injunction hearing. Right. We submitted evidence to that effect, yes, Your Honor. I would say, the reason- What evidence did you submit? The custom and practice of the sheriff's office and the fact that, with respect to these individual plaintiffs, for example, Maurice Boston testified in a deposition, I believe, that he was pushed up the ramp each of the 20 times he went to the Bridgeview Courthouse. The evidence in the record, the evidence that we submitted in support of our motion for summary judgment and against plaintiffs is replete with that. Whenever this issue came up, with perhaps the exception of an isolated incident or two, the sheriff provided assistance when needed. The plaintiffs never did meet their burden. When did the plaintiffs submit their motion for summary judgment? The motion for summary judgment- With respect to the individual, the county's liability to the individuals. I can tell you, Your Honor, when they were decided. Let's see. Well, was it during the preliminary injunction hearing? It was after. It was after. It was after. Okay. It was after. The order granting summary judgments to liability was November 19th, 2015. Did you ever invite the court's attention to the fact that under Beacon against Westover, he was supposed to submit any matter that was common to the equitable relief and the legal relief to a jury? Did you ever tell him that? Oh, sure. In terms of damages. When did you tell him that? They came up with an argument, Your Honor. My recollection during the hearing on the- When did it come up? Well, okay. I think in response to the motion for summary judgment, that's when we brought it up. That these were matters that should be- By that time, he had entered the motion. He had entered the preliminary injunction. He'd entered the preliminary injunction. Yes. Well, hold on. Let's see. Preliminary injunction. Yeah. He had. That's right. He had entered a preliminary injunction. Then, I think the way the sequence was, then he granted the class certification, and then he entered summary judgment in November of 2015. Class cert was April. What I'm concerned about is whether you waived any right you might have had to a jury trial on any issue other than damages. It seems the district court may well have gotten off on the wrong foot when he turned this into a hearing on a permanent injunction. Your Honor, I don't think so. I don't find in that record any place where you said, hey, wait a minute, Judge, you can't do that. You're depriving me of my Seventh Amendment right to a jury trial. Right. Well, we moved for summary judgment, and we opposed their motion for summary judgment as to liability. That was with an eye toward the trial on damages. I think we did, Your Honor. I think by doing that, we preserved the record saying the issue of liability needed to be tried to a jury. At a minimum. Did you bring the jury trial up specifically in your motion? I don't believe we brought the Seventh Amendment up. In opposition to the summary judgment? I don't believe we did. But we did oppose their motion for summary judgment, and we pursued summary judgment on our own. Did we actually make a Seventh Amendment argument? I don't think so. But since we opposed their motion for summary judgment, implicit in that is the notion that these cases should go to a jury trial. This is the same time you moved for summary judgment. Yes, that's right. Yes, both sides moved. It was cross motions for summary judgment. As I indicated, the record is replete with examples of the different plaintiffs. The record is complete with evidence of assistance being given, both in terms of transportation and use of the bathroom facilities. I'd like to move forward, and just to finish, again, I think I've said it before, the record shows the sheriff did not engage in intentional discrimination. If the district court had viewed that evidence to the like most favorable to the sheriff and the county, he would not have entered summary judgment on liability. Moving to the Rule 23b2 class, the definition of this class, as initially pointed out, is indefinite. All persons confined at the jail from August 4, 2012 to the date of entry of judgment who have been or will be classified by jail officials as requiring a wheelchair. Plaintiffs as recently as 2017 moved for injunctive relief with respect to the holding cells at Maywood, and I'll explain shortly, we feel that was inappropriate too. But before I get to that, I'd like to at least focus on whether class certification should have been granted in the first place. We say it should not have been. Initially the class representatives were not adequate. Mr. Lacey was released from the Department of Corrections and was sent to the Illinois Department of Corrections before any injunctive relief was entered. So he could not, by definition under Article 3 in this court's decision, Areola v. Godinez, he could not have been a class rep. And as summary judgment as to liability should not have been entered with respect to the other four plaintiffs, it's not clear they had standing to ask for injunctive relief either. So it seems to me that plaintiffs did not meet their burden of showing that they were adequate class representatives. Typicality and commonality were lacking. Each of the claims as to discrimination as to these individual plaintiffs turned on their own individual set of facts. Could there ever be a viable class given your view on typicality and commonality? I think so, Judge Ripple. I think if you had a situation where there were no ramps or there was no access being given and no attempt to comply with the ADA, I think that would be a common issue. But here the record shows that each of these plaintiffs were being assisted, in the case of, to go back to Maurice Boston, 20 times he shows up to Bridgeview, 20 times he's pushed up the ramp. If anything, the record shows there was no intentional discrimination. Certainly, there was not evidence in the record to warrant issuing a judgment of liability against the sheriff. No, I think there could be common issues and I think typicality could be met. I just don't think it was met here. How many were in the class? I'm sorry? How many were in the class? Yes. How many? Oh, you know, I don't know, you know, I'm not sure about that, Your Honor. I don't think it was very many. I think it was probably no more than 40. I'm not sure there was any veracity. Okay, no more than 40. These are people who are in and out, I guess. Well, there's no doubt. I mean, people, you know, it's a transient population at the Department of Correction, so the number in the class would change from time to time. I'm actually not sure the exact number was ever determined in the record. So, I mean, what is your practical exposure in this case? You don't seem terribly worried about the permanent injunction on the merits. So, yeah. And you don't, and you've got a $600 judgment against you with respect to one of the named members of the class. So, I guess your real exposure here is to other members of the class and what they may be able to develop. Is that right? Well, I think it's two things. There was a finding of liability and a finding that the sheriff engaged in discrimination, a finding we challenged, vigorously challenged. But it's also the ability to keep coming in and to seek injunctive relief, which is the last order I would talk about, and that was the order regarding the privacy screens at the holding cells at the Maywood Courthouse. Now, we feel that that was in supplemental injunctive relief that plaintiffs were able to come in and seek because of a class certification. Like I said, we don't think the class should have been certified, they should have been able to do it, and on top of putting that aside, we don't think the injunction there was appropriate. Now, at page 30 of plaintiff's brief, they explain why, boil down why they think the injunction at Maywood was appropriate. Let me explain what that was about. There are holding cells there, and there's an ADA regulation talking about the distance between privacy screens and the rear wall at a holding cell. And that the ADA standards provides, and I'll read this from their brief, clearance around a water closet shall be 56 inches, minimum measured perpendicular from the rear wall. Now it's 54 and a half inches. Plaintiffs argue, and their argument is based on a provision of the Code of Professional Regulations, 28 CFR 35.151C3, which says, if physical construction or alterations commence on or after March 15, 2012, then new construction alterations subject to this section shall comply with the 2010 standards. Their argument really all boils down to what shall means there. Is shall mandatory, or is shall permissive? This court has recognized it could be both. We submit, Your Honor, that the best reading of shall and that provision, in light of the overall remedial purposes of the ADA, is permissive. And if you look at the injunction that was entered, what ended up happening was the plaintiffs did not prove that the 54 and a half inches caused anyone any meaningful or denied anyone any meaningful or reasonable access to a bathroom facility. They didn't prove that. All they showed was it was 54 and a half inches. We say it should be 56. District Court essentially applied a strict liability standard. Fourth Circuit and Bacon, which we cited, rejected that. We think they're right. The purpose of the ADA is to ensure that reasonable access is provided. It's not there to, you know, so someone could come in and say, well, it's 54 and a half, should be 56. Let's rip up concrete barriers and tear down walls. That's expensive. That, you know, takes away facilities that are needed for a legitimate governmental purpose. If they denied access, that'd be one thing. The plaintiffs should have the burden of proving that. They didn't have the burden here. The District Court didn't make them sustain that burden, and they didn't sustain that burden. So for... What is it? Is that distance supposed to be the ability to turn the wheelchair around? That's right. Back up and go forward and all that kind of thing? Exactly. So the injunction is over one and a half inches. Everyone agrees it's 54 and a half. They're saying, well, it should have been 56. And that's fine if, in fact, they can prove that 56 was necessary for the provision of reasonable access. But that wasn't proven, and we don't think it can be proven, Your Honor. Is this what you're saying will cost $20,000 to correct? I believe that's correct, Your Honor. Yes, it was in the record. So for those... Does this issue apply only to holding cells? In this instance, it does. But I think it could apply... Someone's being kept... In this litigation. Oh, yeah, in this litigation, the holding cells at Maywood. There was an issue about the holding cells at Bridgeview. Plaintiffs were bringing an appeal on that, but they dropped their appeal at some point. So, no, right now, we're just talking about the two holding cells at Maywood, which are adjoined to two other holding cells. They're kind of back-to-back. There's two holding cells and two on the other side, and they have a shared wall. One holding cell for two courtrooms? I believe so. That's right. So if Your Honors have no further questions, I would ask to reserve the rest of my time for rebuttal, and we'd ask that the orders I mentioned earlier on the holding of summary judgments to liability, the jury verdict in favor of Mr. Lacey, the order granting class certification, and the injunction order regarding the Maywood holding cells all be reversed. Thank you. Thank you, Counsel. Thank you. Mr. Morrisey. May it please the Court. My name is Patrick Morrisey, and I'm one of the attorneys for the plaintiff's appellees in this case. In August of 2014, several wheelchair users at the Cook County Jail filed suit against the Sheriff of Cook County and Cook County to allege specific barriers they faced when attending court. The District Court held a seven-day hearing on plaintiff's motion for an injunctive relief. At what point did he tell everybody that hearing was going to result in a permanent as opposed to a preliminary injunction? Your Honor, on plaintiff's motion under Rule 65A2, the District Court entered an order on December 18, 2014 explaining that plaintiff's application for permanent relief would move forward. And that was during the hearing? Your Honor, it was two days after the hearing started. The hearing started on December 16, 2014 and continued all the way to February 27, 2016. Now, at that point or at any point thereafter, did the defendants object to proceeding with a hearing on the permanent injunction of the District Court entering findings of fact? After that order was entered, I do not believe so, Your Honor. And the District Court held hearings over the course of three months, a few days each month, to address barriers that wheelchair users were all facing when they attended court. Five suburban courthouses in Cook County all had ramps that were steep and long. Each holding cell in the suburban courthouses, excuse me, each courthouse in the suburban courthouse, there were five, all had holding cells in the basement where all wheelchair users and all prisoners were staged before court. At that point... Well, let me get... That's one of the questions I had. The holding cells were not adjacent to the courtroom. That's correct, Your Honor. They were all in the basement of the courthouse once the wheelchair user ascended the ramp. And there was nothing that complied with the ADA structural standards at the time. They mentioned Mr Boston. Mr Boston initially was held in a coat room without any toilet or sink because it was the only holding cell that was large enough for a wheelchair user to fit in. Everybody faced the same type of toilet. And there were only two toilets in the whole county courthouse that were compliant. There were two holding cells on the upper level of Maywood, which was not used for wheelchair users because, as I said, they were all held in the basement. Mr Morris, if we could stop there just for a moment. When is there a violation of the ADA? When the prisoner is exposed to or confronted with non-complying equipment or when he actually has a need for the use of the equipment and it's not there for him? What I'm concerned about is whether or not there is, in effect, a complete violation of the ADA when they're on non-conforming equipment. But it happens that a prisoner is not bothered by that simply because somebody steps forward to help him or because he manages anyway. If this is framed in the context of a class, the class takes on its own separate existence. And I believe when a wheelchair user is faced with barriers and the Supreme Court addressed this in Tennessee v. Lane about a wheelchair user having to crawl up the stairs to reach the second floor of the courtroom or a court reporter not being able to perform work because she doesn't have the ability to move, that's an easier explanation of an obvious ADA violation. But I believe it's similar when a wheelchair user has to go up a ramp that's too steep and it causes him or her pain. Or they have the uncomfort or discomfort of having to go through barriers that shouldn't be there because Congress explained that there should be uniform standards for people in this category. How about the prisoner who has to hope that a kind guard will step forward and help him? I don't believe a prisoner should have to hope. The ADA in Tennessee v. Lane and the regulations that the ADA is implemented under say that when there are structural barriers, the government entity under Title II has an obligation to come forward and relocate services so that the disabled person can access it. So it's the confrontation with the barrier that creates the violation in your view? I think so. There's also some heightened scrutiny under Tennessee v. Lane when it's some elemental feature in our society like going to court. I don't believe wheelchair users should have to attend court. In Cook County they go from the Cook County Jail to the suburban courthouses and they're there all day and have to face the barriers of not being able to toilet  Another issue that I haven't addressed is Layton. Layton, similar to the suburban courthouses, have this steep ramp. They have two steep ramps in the lower level. Everybody in this case agreed that a reasonable accommodation for this non-ADA compliant barrier is for the Sheriff's employees to push people up and down the ramp. That has full support in the ADA regulations. It has support from Tennessee v. Lane and it was not consistently followed up until March 1, 2018 the District Judge, after reviewing several motions about non-compliance with this permanent injunction that was entered back in October the language was crafted in January 5, 2016. The Sheriff did not implement this language required by the District Judge until August 1, 2017. And after this language was entered there were instances where wheelchair users still went up and down this Layton ramp unassisted and by agreement of the parties, the Sheriff and the County agreed that the District Judge should enter an order that provides a team of wheelchair users a team of officers working at the Layton Courthouse should push people up and down. There should be signs clearly explaining the government's obligation to move these wheelchair users up and down and it was read in roll call to provide further explanation that this is something that's important. So this is how you explain the zero verdict for some of these individuals. In other words they were confronted with a barrier it just so happens that the jury didn't think they suffered a specific harm that was compensable because of that. That's true, Your Honor. Two plaintiffs recovered no damages for violations of the ramp and going to the bathroom. There was one plaintiff who acquiesced to judgment in the amount of zero dollars prior to trial. There was one plaintiff, Mr. Kevin Dawson who agreed to a monetary settlement on the day of trial. And Mr. Lacey was the sole plaintiff who was found to have suffered damages for the violations. And speaking about Mr. Lacey, there's no dispute that he went up and down this ramp unassisted. It was in the summary judgment papers that he went up and down by himself. He didn't have to hope whether an officer pushed him up. He asked for help and he was told by an officer there's not going to be any help for you to go up and down the ramp. We can't touch you. And he went to court on the 7th floor of the Layton courthouse to this day has no ADA compliant bathrooms. When he went to court, there was a holding cell he was placed in. Most of the times he went it was from April or May of 2014 over to September of 2014. And there was a gate that separated the holding area from the toilet area. And he couldn't make it. The passageway was not large enough for his wheelchair to fit in. So he was denied the access of toileting. He didn't have any accidents, but he experienced discomfort from this experience. And they had a policy that was implemented by the sheriff prior to Mr. Lacey's incarceration. And it was on April 19th of 2014, the chief of the Layton courthouse, Mr. Banks, issued a memorandum to employees that worked at the sheriff's office explaining there are no ADA compliant toilets at the Layton courthouse for inmates. The procedure in the event of an emergency is the inmate should request assistance by a correctional officer to be moved over to a public bathroom. How often, I'm trying to envision this, how often is there a wheelchair prisoner that encounters this? That can't be every day. At Layton criminal courthouse, there's between 10 and 15 wheelchair users who attend court each week. How many? 10 to 15 wheelchair users who attend court each week. And that was a statement agreed to by the parties at summary judgment. That answers one question. So it is something that could be a daily event. Yes, sir. And apparently when that prisoner arrives on the docket or wherever they label them, it isn't automatically somebody. When I envision a ramp, I'm not sure about how much effort it takes to go up and push yourself up. What I envision is when someone loses control of it and it rolls, going up or down. That may be naive. I don't know. But it seems to me that would be the biggest problem. I can understand people that push all day or whatever they do. I know there's a lot of variations. That's what kind of confused me about this case is why there isn't a automatically and maybe you would have already explored that why automatically when there's a wheelchair that person gets extra attention without any question. That was the purpose of this case, Your Honor. And the district judge entered a permanent injunction requiring this type of movement and now because of the order that was entered on March 1, 2018, the sheriff has a team. He had what? There was an order. Plaintiffs filed a motion for a rule to show cause because all this information is on video. There was evidence that plaintiffs uncovered that showed that wheelchair users, even after the district judge's injunction was entered, the sheriff still did not push people up and down the ramp. And March 1, 2018, the sheriff of Cook County agreed to an additional order by the district court that a team of officers would be stationed at this ramp area with the sole purpose of pushing people up and down. So now the court's concern about the timing of wheelchair users, it's been resolved in this case. There's certainty now that wheelchair users will be addressed with this barrier when they attend court. You have answered Judge Manning's question about the latent courthouse, but how about the suburban courthouses? How often do they encounter wheelchair...? Less frequently, Your Honor. There's about 60 wheelchair users at the Cook County Jail at any given time. 60? 60, Your Honor. And it's a transient population, it fluctuates. The good news about the five suburban courthouses is that the ramps have all been renovated in response to this litigation. So wheelchair users now don't have this common barrier that they face. The sheriff in the county addressed the holding cell issue because either two or three holding cells in the lower level now have for the most part ADA compliant features. So wheelchair users at the suburban courthouses now do not have the same barriers that is continued to be experienced by wheelchair users at Layton.  a significant amount of money to remedy the ramp. They agreed to spend money to renovate all the secured side of the courthouse. It was supposed to be completed about two or three years after the district court entered the permanent injunction. As we explained to the district court a few months ago, the government now says it might take four years  So wheelchair users still face some barriers when they attend court, but the ramp is addressed and I believe by agreement of the parties the accommodation that the sheriff agrees is reasonable to push people up is satisfied. Addressing Mr. Lacey's toilet access issue, the emergency procedure that they had in place when he was in custody was to request an officer in the event the officer would then if it was practical, move him to a public bathroom. The chief of the courthouse testified at the injunction hearing before the district court and explained from the issuance of that memorandum in April of 2014 until the time he testified before the district judge at the injunction hearing, he was not aware of anybody using that emergency procedure. And that was the emergency procedure that Mr. Lacey experienced when he attended court. That was the basis for the district court finding that the toilet access and the reasonable accommodation offered by the defendants in this case did not satisfy the obligations imposed by Title II because this reasonable accommodation that was proposed by the defendants was not in fact followed. And that was a basis for finding Mr. Lacey was deprived of benefit of the toilet access and he went up and down the ramp without assistance and that was the benefit of moving up and down the ramp and that was a violation of the law. Turning to the other significant issue, there is this component of deliberate indifference that a plaintiff must prove if seeking to pursue damages, only damages under Title II of the ADA. And I believe the parties agree the standard for deliberate indifference. It's knowing a harm to a federally protected right is substantially likely and the government failing to act upon that likelihood. And we know from the summary judgment record that was litigated in district court. The county made a full scale ADA compliance assessment in the late 90's. They hired a architect and conducted an accessibility study. This accessibility study in the 90's was only limited to the publicly accessed areas of the courthouse. In the publicly accessed areas, the county government agreed to renovate the ramps that the general public had to go up and down. They agreed to renovate the bathroom facilities that the public had access to. But they did not extend this over to the secure side of the building. And that was a principal reason why the district court found intentional discrimination. Because they limited this to the publicly accessed areas. In addition, there was other evidence in the summary judgment record that the district judge relied on in finding intentional discrimination. There was a case in 2008 called Phipps v. Sheriff of Cook County relating to wheelchair users who were incarcerated at the Cook County Jail. And that was a class action relating to toilet access for wheelchair users. And because of that litigation the Sheriff of Cook County and the county renovated areas in the Cook County Jail so that people in wheelchairs and who had disabilities could actually use the toilets. What about the courtrooms themselves? Courtrooms themselves the ADA, excuse me, the public the county government addressed the courtrooms with that 1998 accessibility study. So the county government made the courtrooms ADA compliant. But they limited it to the public areas like we're here today. They did not move and make this assessment behind the bench. And the areas where the inmates and people in custody are generally assigned. What about the witness areas and that sort of thing? I believe I've seen some courtrooms that perhaps are not compliant with the ADA standards. So I can't speak to that. I would assume that that was a portion of the county government's assessment. But I'm speculating on that portion. The district judge also considered this memo by Chief Banks on April 19th of 2014 to further find that the sheriff and the county knew about this. About the fact that there were no ADA compliant bathrooms in Layton. And to find intentional discrimination. Turning to the final issue, the Maywood Courthouse. The county spent $30,000 on two holding cells to make each ADA compliant or the intent was to make it ADA compliant. When they initially started this assessment the original plans called for moving this privacy screen back. And that's what they did in every other courthouse. Every other lower level courthouse they moved that privacy screen to create the floor space. And the argument defendants pursue now is that it's not technically feasible. But that's not correct because for $10,000 for each holding cell the county government could make the correction to make the toilet area, the place where the wheelchair user would move, compliant with the law. And the district judge made this review based on evidence. And if you look at the preliminary injunction transcript the court reviewed videos. And the district court found that the state of the current renovations in Maywood, they were nice in general sense, but they're too small for wheelchair users. And when you're talking about a class action some people obviously could use the toilets but in the sense of what the law requires and the obligations imposed by the government when they pursued these renovations, they should have followed the regulations required by the ADA and the toilet area. So even if the 2.5 inches from a practical standpoint you can get by on that. It's the absolute technical violation of the law that seems to be the reason why this is a violation. Your Honor, in addition to the not following what the regulations explain the district judge made a factual finding that should be reviewed by clear error that they were too small to use. And it made little sense to go forward and spend $60,000 for two holding cells but neglect to spend the extra $20,000 to remove the privacy screen. And if there are... It's made that determination that it needed that 2.5 inches? Yes, Your Honor. If there are no further questions from the panel we would ask that the court affirm the decision of the district court. Thank you. Thank you, counsel. Just a few brief things on rebuttal. Judge Ripple, to answer your question regarding whether the defendants were aware they were conducting a permanent injunction hearing. The district court never said whether the hearing was going to be for permanent or preliminary injunctive relief. What he did say was that he wanted to give the court and the county and the sheriff an opportunity to rectify the problem. The hearing went forward in early 2015. We're being unclear whether or not preliminary or permanent injunctive relief would ultimately be entered. Permanent injunction was entered the following year in January 2016. Your representation is that you were completely unaware that the district court was going to enter a...was holding a hearing for a preliminary injunction when he held that 7-day hearing. We thought it was possible that it could ultimately be permanent, but it wasn't clear that that was the case. The motion itself was for a preliminary injunction. Plaintiffs didn't move and ask that the injunction be considered permanent, but it was never clear. The district court did not make it clear what kind of procedure it was. When he entered the permanent injunction did you object? We did. When the permanent injunction was not clear...well, actually, no. The original order was not clear to us whether it was meant to be permanent or preliminary. So we filed a Rule 59e motion. At that point we were told it was a permanent injunction and we did object. On what ground? I believe the objection, Your Honor, was on the ground that the plaintiffs had not met their burden and not shown that the sheriff had engaged in intentional discrimination. The evidence didn't support it. So we did...we've objected to this the whole way and we continue...we stand here today saying there has never been proof that the sheriff engaged in intentional discrimination. Mr. Boston came up again, he testified in his deposition that there was never an instance when he was not provided assistance when he needed to use the bathroom. Mr. Lacey said the same thing. He said that when he needed to use the bathroom he would ask an officer who would then immediately escort him to a bullpen to use the bathroom. So the record just doesn't back up the plaintiff's claims. When help was needed, it was given. There may have been an isolated instance, but it was not common practice and it certainly was not a pattern of intentional discrimination. Just to finish on the injunction at the Maywood Courthouse, the problem with that hearing was the legal standard, Your Honor. It was...the standard was essentially a strict liability one. Is it 56? If it's 54 and a half inches, it's no good. It has to be replaced. That's not the standard. We urge at the time and we urge now that the standard from the Fourth Circuit and Bacon makes a lot more sense to not go with strict liability, to not read shall as in that provision of the Code of Federal Regulations 35.15 C3 to read shall there as mandatory but rather as permissive. If plaintiffs would come in and provide evidence to show the reasonable and meaningful access was not given, then they would have a claim. But they didn't do that. They weren't required to do that. They should have been required to do that. We think that injunction should be reversed. And if this Court has no further questions, we ask that the orders we appeal be reversed. Thank you, Counsel. Thank you, Your Honor. Mr. Morrissey, Judge Ripple has a question he'd like to ask. Mr. Morrissey, I would just like to know whether you agree with the representation that was just made to us that the parties were not made aware that the district court was going to treat the hearing as a permanent injunction hearing until after he entered the preliminary injunction or the permanent injunction. I strongly disagree because when we were asked to convert the hearing under 65 to a permanent injunction, we had all these hearings. And honestly, throughout the hearings, things changed. The county modified the procedures and the district court gave the county and the sheriff every opportunity to move forward with making these changes. And if you look at the court reviews, the memorandum of opinion on the injunction, permanent injunction, the district court in the first page explains, first asked for preliminary, they then asked for permanent injunction, they then asked for a different type of relief, we also asked for declaratory relief. Thank you, Your Honor. Mr. Cassone, do you have any response? Briefly, Your Honor, I think Mr. Morrissey's answer showed back to the original point I made, there was a conflation of different motions and it was not always clear what was being discussed until today. So again, for the reasons I stated, we'd ask for reversal. Thank you, Judge. Thank you to both counsel and the case will be taken under advisement.